# UNITED STATES *v.* WARD, ᴅʙᴀ L. O. WARD OIL & GAS OPERATIONS

No. 79–394.   Argued February 26, 1980—Decided June 27, 1980

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, and POWELL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post,* p. 255. STEVENS, J., filed a dissenting opinion, *post,* p. 257.

*Edwin S. Kneedler* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, Jacques B. Gelin,* and *Michael A. McCord.*

*Stephen Jones* argued the cause for respondent. With him on the brief was *David C. Butler.**

---

*James G. Watt* filed a brief for the Mountain States Legal Foundation et al. as *amici curiae* urging affirmance.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The United States seeks review of a decision of the United States Court of Appeals for the Tenth Circuit that a proceeding for the assessment of a "civil penalty" under § 311 (b)(6) of the Federal Water Pollution Control Act (FWPCA) is a "criminal case" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination. We granted certiorari, 444 U. S. 939, and now reverse.

## I

At the time this case arose,[1] § 311 (b)(3) of the FWPCA prohibited the discharge into navigable waters or onto adjoining shorelines of oil or hazardous substances in quantities determined by the President to be "harmful."[2] Section 311 (b)(5) of the Act imposed a duty upon "any person in charge of a vessel or of an onshore facility or an offshore facility" to report any discharge of oil or a hazardous substance into navigable waters to the "appropriate agency" of the United States Government. Should that person fail to supply such notification, he or she was liable to a fine of not more than $10,000 or imprisonment of not more than one year. Section 311 (b)(5) also provided for a form of "use immunity," specifying that "[n]otification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement." 33 U. S. C. § 1321 (b)(5).[3]

---

[1] Section 311 was amended by the Clean Water Act of 1977, Pub. L. 95–217, 91 Stat. 1566, and the Federal Water Pollution Control Act Amendments of 1978, Pub. L. 95–576, 92 Stat. 2468. Except as noted, those amendments have no bearing on the present case. See nn. 2 and 4, *infra*.

[2] Section 311 (b)(3) was amended by the Federal Water Pollution Control Act Amendments of 1978, Pub. L. 95–576, 92 Stat. 2468, to prohibit the discharge of oil and hazardous substances "in such quantities as *may* be harmful" (emphasis added), as determined by the President.

[3] At the time in question, § 311 (b)(5) read in full:

"Any person in charge of a vessel or of an onshore facility or an offshore

Section 311 (b)(6) provided for the imposition of a "civil penalty" against "[a]ny owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation" of the Act. In 1975, that subsection called for a penalty of up to $5,000 for each violation of the Act.[4] In assessing penalties, the Secretary of the appropriate agency was to take into account "the appropriateness of such penalty to the size of the business or of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation. . . ." 33 U. S. C. § 1321 (b)(6).[5]

---

facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement."

[4] Section 311 (b)(6) was amended by the Federal Water Pollution Control Act Amendments of 1978, Pub. L. 95–576, 92 Stat. 2468, to authorize civil penalties of up to $50,000 per offense, or up to $250,000 per offense in cases where the discharge was the result of willful negligence or misconduct.

[5] At the time of the discharge in this case, § 311 (b)(6), as set forth in 33 U. S. C. § 1321(b)(6), read:

"Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered

According to § 311 (k) of the Act, funds collected from the assessment of penalties under § 311 (b)(6) were to be paid into a "revolving fund" together with "other funds received . . . under this section" and any money appropriated to the revolving fund by Congress. See 33 U. S. C. § 1321 (k). Money contained in this fund was to be used to finance the removal, containment, or dispersal of oil and hazardous substances discharged into navigable waters and to defray the costs of administering the Act. 33 U. S. C. § 1321 (l). Another section of the Act allowed the United States Government to collect the costs of removal, containment, or dispersal of a discharge from the person or corporation responsible for that discharge in cases where that person or corporation had been identified. 33 U. S. C. § 1321 (f).

On or about March 23, 1975, oil escaped from an oil retention pit at a drilling facility located near Enid, Okla., and eventually found its way into Boggie Creek, a tributary of the Arkansas River system.[6] At the time of the discharge, the premises were being leased by respondent L. O. Ward, who was doing business as L. O. Ward Oil & Gas Operations. On April 2, 1975, respondent Ward notified the regional office of the Environmental Protection Agency (EPA) that a discharge of oil had taken place. Ward later submitted a more complete written report of the discharge, which was in turn forwarded to the Coast Guard, the agency responsible for assessing civil penalties under § 311 (b)(6).

After notice and opportunity for hearing, the Coast Guard assessed a civil penalty against respondent in the amount

---

by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 91 of Title 46 of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary."

[6] All parties concede that Boggie Creek is a "navigable water" within the meaning of 33 U. S. C. § 1362 (7).

of $500. Respondent filed an administrative appeal from this ruling, contending, *inter alia*, that the reporting requirements of § 311 (b)(5) of the Act violated his privilege against compulsory self-incrimination. The administrative appeal was denied.

On April 13, 1976, Ward filed suit in the United States District Court for the Western District of Oklahoma, seeking to enjoin the Secretary of Transportation, the Commandant of the Coast Guard, and the Administrator of EPA from enforcing §§ 311 (b)(5) and (6) and from collecting the penalty of $500. On June 4, 1976, the United States filed a separate suit in the same court to collect the unpaid penalty. The District Court eventually ordered the two suits consolidated for trial.

Prior to trial, the District Court rejected Ward's contention that the reporting requirements of § 311 (b)(5), as used to support a civil penalty under § 311 (b)(6), violated his right against compulsory self-incrimination. The case was tried to a jury, which found that Ward's facility did, in fact, spill oil into Boggie Creek. The District Court, however, reduced Ward's penalty to $250 because of the amount of oil that had spilled and because of its belief that Ward had been diligent in his attempts to clean up the discharge after it had been discovered.

The United States Court of Appeals for the Tenth Circuit reversed. *Ward v. Coleman*, 598 F. 2d 1187 (1979). Although admitting that Congress had labeled the penalty provided for in § 311 (b)(6) as civil and that the use of funds collected under that section to finance the administration of the Act indicated a "remedial" purpose for the provision, the Court of Appeals tested the statutory scheme against the standards set forth in *Kennedy v. Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963),[7] and held that § 311 (b)(6) was sufficiently

---

[7] The standards set forth were "[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*,

punitive to intrude upon the Fifth Amendment's protections against compulsory self-incrimination. It therefore reversed and remanded for further proceedings in the collection suit.

## II·

The distinction between a civil penalty and a criminal penalty is of some constitutional import. The Self-Incrimination Clause of the Fifth Amendment, for example, is expressly limited to "any criminal case." Similarly, the protections provided by the Sixth Amendment are available only in "criminal prosecutions." Other constitutional protections, while not explicitly limited to one context or the other, have been so limited by decision of this Court. See, *e. g., Helvering* v. *Mitchell,* 303 U. S. 391, 399 (1938) (Double Jeopardy Clause protects only against two criminal punishments); *United States* v. *Regan,* 232 U. S. 37, 47–48 (1914) (proof beyond a reasonable doubt required only in criminal cases).

This Court has often stated that the question whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction. See, *e. g., One Lot Emerald Cut Stones* v. *United States,* 409 U. S. 232, 237 (1972); *Helvering* v. *Mitchell, supra,* at 399. Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. See *One Lot Emerald Cut Stones* v. *United States, supra,* at 236–237. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statu-

---

whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. . . ." 372 U. S., at 168–169 (footnotes omitted).

tory scheme was so punitive either in purpose or effect as to negate that intention. See *Flemming* v. *Nestor,* 363 U. S. 603, 617–621 (1960). In regard to this latter inquiry, we have noted that "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." *Id.,* at 617. See also *One Lot Emerald Cut Stones* v. *United States, supra,* at 237; *Rex Trailer Co.* v. *United States,* 350 U. S. 148, 154 (1956).

As for our first inquiry in the present case, we believe it quite clear that Congress intended to impose a civil penalty upon persons in Ward's position. Initially, and importantly, Congress labeled the sanction authorized in § 311 (b)(6) a "civil penalty," a label that takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph, § 311 (b)(5). Thus, we have no doubt that Congress intended to allow imposition of penalties under § 311 (b)(6) without regard to the procedural protections and restrictions available in criminal prosecutions.

We turn then to consider whether Congress, despite its manifest intention to establish a civil, remedial mechanism, nevertheless provided for sanctions so punitive as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Rex Trailer Co.* v. *United States, supra,* at 154. In making this determination, both the District Court and the Court of Appeals found it useful to refer to the seven considerations listed in *Kennedy* v. *Mendoza-Martinez, supra,* at 168–169. This list of considerations, while certainly neither exhaustive nor dispositive, has proved helpful in our own consideration of similar questions, see, *e. g., Bell* v. *Wolfish,* 441 U. S. 520, 537–538 (1979), and provides some guidance in the present case.

Without setting forth here our assessment of each of the seven *Mendoza-Martinez* factors, we think only one, the fifth, aids respondent. That is a consideration of whether "the

behavior to which [the penalty] applies is already a crime." 372 U. S., at 168–169. In this regard, respondent contends that § 13 of the Rivers and Harbors Appropriation Act of 1899, 33 U. S. C. § 407, makes criminal the precise conduct penalized in the present case. Moreover, respondent points out that at least one federal court has held that § 13 of the Rivers and Harbors Appropriation Act defines a "strict liability crime," for which the Government need prove no scienter. See *United States* v. *White Fuel Corp.*, 498 F. 2d 619 (CA1 1974). According to respondent, this confirms the lower court's conclusion that this fifth factor "falls clearly in favor of a finding that [§ 311 (b)(6)] is criminal in nature." 598 F. 2d, at 1193.

While we agree that this consideration seems to point toward a finding that § 311 (b)(6) is criminal in nature, that indication is not as strong as it seems at first blush. We have noted on a number of occasions that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission." *Helvering* v. *Mitchell, supra,* at 399; *One Lot Emerald Cut Stones* v. *United States, supra,* at 235. Moreover, in *Helvering,* where we held a 50% penalty for tax fraud to be civil, we found it quite significant that "the Revenue Act of 1928 contains two separate and distinct provisions imposing sanctions," and that "these appear in different parts of the statute. . . ." 303 U. S., at 404. See also *One Lot Emerald Cut Stones* v. *United States, supra,* at 236–237. To the extent that we found significant the separation of civil and criminal penalties within the same statute, we believe that the placement of criminal penalties in one statute and the placement of civil penalties in another statute enacted 70 years later tends to dilute the force of the fifth *Mendoza-Martinez* criterion in this case.

In sum, we believe that the factors set forth in *Mendoza-Martinez,* while neither exhaustive nor conclusive on the issue, are in no way sufficient to render unconstitutional the congres-

sional classification of the penalty established in § 311 (b)(6) as civil. Nor are we persuaded by any of respondent's other arguments that he has offered the "clearest proof" that the penalty here in question is punitive in either purpose or effect.

## III

Our conclusion that § 311 (b)(6) does not trigger all the protections afforded by the Constitution to a criminal defendant does not completely dispose of this case. Respondent asserts that, even if the penalty imposed upon him was not sufficiently criminal in nature to trigger other guarantees, it was "quasi-criminal," and therefore sufficient to implicate the Fifth Amendment's protection against compulsory self-incrimination. He relies primarily in this regard upon *Boyd* v. *United States*, 116 U. S. 616 (1886), and later cases quoting its language.

In *Boyd*, appellants had been indicted under § 12 of an "Act to amend the customs revenue laws and to repeal moieties," for fraudulently attempting to deprive the United States of lawful customs duties payable on certain imported merchandise. According to the statute in question, a person found in violation of its provisions was to be "fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both; and, in addition to such fine, such merchandise shall be forfeited." 116 U. S., at 617. Despite the pending indictment, appellants filed a claim for the goods held by the United States. In response, the prosecutor obtained an order of the District Court requiring appellants to produce the invoice covering the goods at issue. Appellants objected that such an order violated the Fourth and Fifth Amendments by subjecting them to an unreasonable search and seizure and by requiring them to act as witnesses against themselves.

This Court found the Fifth Amendment applicable, even though the action in question was one contesting the forfeiture

of certain goods. According to the Court: "We are . . . clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal." *Id.*, at 633–634. While at this point in its opinion, the Court seemed to limit its holding to proceedings involving the forfeiture of property, shortly after the quoted passage it broadened its reasoning in a manner that might seem to apply to the present case: "As, therefore, suits for *penalties and forfeitures* incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself. . . ." *Id.*, at 634 (emphasis added).

Seven years later, this Court relied primarily upon *Boyd* in holding that a proceeding resulting in a "forfeit and penalty" of $1,000 for violation of an Act prohibiting the employment of aliens was sufficiently criminal to trigger the protections of the Self-Incrimination Clause of the Fifth Amendment. *Lees* v. *United States,* 150 U. S. 476 (1893). More recently, in *One 1958 Plymouth Sedan* v. *Pennsylvania,* 380 U. S. 693 (1965), and *United States* v. *United States Coin & Currency,* 401 U. S. 715 (1971), this Court applied *Boyd* to proceedings involving the forfeiture of property for alleged criminal activity. *Plymouth Sedan* dealt with the applicability of the so-called exclusionary rule to a proceeding brought by the State of Pennsylvania to secure the forfeiture of a car allegedly involved in the illegal transportation of liquor. *Coin & Currency* involved the applicability of the Fifth Amendment privilege against compulsory self-incrimination in a proceeding brought by the United States to secure for-

feiture of $8,674 found in the possession of a gambler at the time of his arrest.

Read broadly, *Boyd* might control the present case. This Court has declined, however, to give full scope to the reasoning and dicta in *Boyd*, noting on at least one occasion that "[s]everal of *Boyd*'s express or implicit declarations have not stood the test of time." *Fisher* v. *United States*, 425 U. S. 391, 407 (1976). In *United States* v. *Regan*, 232 U. S. 37 (1914), for example, we declined to apply *Boyd*'s classification of penalties and forfeitures as criminal in a case where a defendant assessed with a $1,000 penalty for violation of the Alien Immigration Act claimed that he was entitled to have the Government prove its case beyond a reasonable doubt. *Boyd* and *Lees*, according to *Regan*, were limited in scope to the Fifth Amendment's guarantee against compulsory self-incrimination, which "is of broader scope than are the guarantees in Art. III and the Sixth Amendment governing trials and criminal prosecutions." 232 U. S., at 50. See also *Helvering* v. *Mitchell*, 303 U. S., at 400, n. 3. Similarly, in *Hepner* v. *United States*, 213 U. S. 103 (1909), this Court upheld the entry of a directed verdict against the appellant under a statute similar to that examined in *Lees*. According to *Hepner*, "the *Lees* and *Boyd* cases do not modify or disturb but recognize the general rule that penalties may be recovered by civil actions, although such actions may be so far criminal in their nature that the defendant cannot be compelled to testify against himself in such actions in respect to any matters involving, or that may involve, his being guilty of a criminal offense." *Id.*, at 112.

The question before us, then, is whether the penalty imposed in this case, although clearly not "criminal" enough to trigger the protections of the Sixth Amendment, the Double Jeopardy Clause of the Fifth Amendment, or the other procedural guarantees normally associated with criminal prosecutions, is nevertheless "so far criminal in [its] nature"

as to trigger the Self-Incrimination Clause of the Fifth Amendment. Initially, we note that the penalty and proceeding considered in *Boyd* were quite different from those considered in this case. *Boyd* dealt with forfeiture of property, a penalty that had absolutely no correlation to any damages sustained by society or to the cost of enforcing the law. See also *Lees* v. *United States, supra* (fixed monetary penalty); *One 1958 Plymouth Sedan* v. *Pennsylvania, supra* (forfeiture); *United States* v. *United States Coin & Currency, supra* (forfeiture). Here the penalty is much more analogous to traditional civil damages. Moreover, the statute under scrutiny in *Boyd* listed forfeiture along with fine and imprisonment as one possible punishment for customs fraud, a fact of some significance to the *Boyd* Court. See 116 U. S., at 634. Here, as previously stated, the civil remedy and the criminal remedy are contained in separate statutes enacted 70 years apart. The proceedings in *Boyd* also posed a danger that the appellants would prejudice themselves in respect to later criminal proceedings. See *Hepner* v. *United States, supra,* at 112. Here, respondent is protected by § 311 (b)(5), which expressly provides that "[n]otification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except [for] prosecution for perjury or for giving a false statement." 33 U. S. C. § 1321 (b)(5).

More importantly, however, we believe that in the light of what we have found to be overwhelming evidence that Congress intended to create a penalty civil in all respects and quite weak evidence of any countervailing punitive purpose or effect it would be quite anomalous to hold that § 311 (b) (6) created a criminal penalty for the purposes of the Self-Incrimination Clause but a civil penalty for all other purposes. We do not read *Boyd* as requiring a contrary conclusion.

## IV

We conclude that the penalty imposed by Congress was civil, and that the proceeding in which it was imposed was not "quasi-criminal" as that term is used in *Boyd* v. *United States, supra.* The judgment of the Court of Appeals is therefore

*Reversed.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE MAR-SHALL joins, concurring in the judgment.

I agree with the Court that a proceeding for assessment of a monetary penalty under § 311 (b)(6) of the Federal Water Pollution Control Act, 33 U. S. C. § 1321 (b)(6), is not a "criminal case" within the meaning of the Fifth Amendment. I reach this conclusion, however, for a number of reasons in addition to those discussed in the Court's opinion.

The Court of Appeals engaged in a careful analysis of the standards set forth in *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168–169 (1963), for distinguishing civil from criminal proceedings. These standards are cataloged in a footnote of the Court's opinion. *Ante,* at 247–248, n. 7. The Court of Appeals concluded that some of the seven stated factors offered little guidance in this case, while others supported a "criminal" designation. In particular, it found that scienter played a part in determining the amount of penalty assessments; that the penalties promote traditional retributive aims of punishment; that behavior giving rise to the assessment is subject to criminal punishment under § 13 of the Rivers and Harbors Appropriation Act of 1899, 33 U. S. C. § 407; and that the criteria employed by the Coast Guard to set the amount of assessments permit penalties that may be excessive in relation to alternative remedial or nonpunitive purposes. *Ward* v. *Coleman,* 598 F. 2d 1187, 1192–1194 (CA10 1979). The Court is content to discuss only one of

these findings. See *ante,* at 249–250. Because of the consideration given the others by the Court of Appeals, I think they deserve brief discussion, too.

My analysis of these other factors differs from that of the Court of Appeals in two principal respects. First, I do not agree with that court's apparent conclusion that none of the *Mendoza-Martinez* factors strongly supports a "civil" designation for a penalty proceeding under § 311 (b)(6). I conclude that imposition of a monetary penalty under this statute does not result in the imposition of an "affirmative disability or restraint" within the meaning of *Mendoza-Martinez,* 372 U. S., at 168; that monetary assessments are traditionally a form of civil remedy; and that, as the Court of Appeals conceded, 598 F. 2d., at 1193, § 311 (b)(6) serves remedial purposes dissociated from punishment. Although any one of these considerations by itself might not weigh heavily in favor of a "civil" designation, I think that cumulatively they point significantly in that direction.

Second, I would assign less weight to the role of scienter, the promotion of penal objectives, and the potential excessiveness of fines than did the Court of Appeals. *Mendoza-Martinez* suggested that a sanction that "comes into play *only* on a finding of *scienter*" might be indicative of a criminal proceeding. 372 U. S., at 168 (first emphasis added). Plainly, that is not the case here. Scienter is not mentioned on the face of the statute, and it is only one of many factors relevant to determination of an assessment under Coast Guard Commandant Instruction 5922.11B (Oct. 10, 1974). Furthermore, although the fines conceivably could be used to promote primarily deterrent or retributive ends, the fact that collected assessments are deposited in a revolving fund used to defray the expense of cleanup operations is a strong indicator of the pervasively civil and compensatory thrust of the statutory scheme. See § 311 (k), 33 U. S. C. § 1321 (k). Finally, while some of the factors employed by the Coast Guard to set

the amount of assessments undoubtedly could be used to exact excessive penalties, others are expressly related to the cost of cleanup and other remedial considerations. In the absence of evidence that excessive penalties actually have been assessed, I would be inclined to regard their likelihood as remote.

For these reasons, I agree with the Court that only the fifth *Mendoza-Martinez* factor, "whether the behavior to which [the sanction] applies is already a crime," 372 U. S., at 168, supports the respondent. Since I feel that this factor alone does not mandate characterization of the proceeding as "criminal" for purposes of the Fifth Amendment, particularly when other factors weigh in the opposite direction, I concur in the judgment.

MR. JUSTICE STEVENS, dissenting.

There are a host of situations in which the Government requires the citizen to provide it with information that may later be useful in proving that the citizen has some liability to the Government. In determining whether the combination of compulsion and liability is consistent with the Fifth Amendment, I would look to two factors: first, whether the liability actually imposed on the citizen is properly characterized as "criminal" and second, if so, whether the compulsion of information was designed to assist the Government in imposing such a penalty rather than furthering some other valid regulatory purpose.

Although this case is admittedly a close one, I am persuaded that the monetary penalty imposed on respondent pursuant to § 311 (b)(6) of the Federal Water Pollution Control Act, 33 U. S. C. § 1321 (b)(6), was a "criminal" sanction for purposes of the Fifth Amendment protection against compelled self-incrimination. As the Court of Appeals pointed out, penalties under § 311 (b)(6) are not calculated to reimburse the Government for the cost of cleaning up an

oil spill.[1]  Rather, this part of the statute is clearly aimed at exacting retribution for causing the spill:

> "The penalties are based on such factors as the gravity of the violation, the degree of culpability and the prior record of the party.  The fact that a party acted in good faith, could not have avoided the discharge and, once it occurred, undertook clean-up measures immediately is to be given no consideration in relation to the 'imposition or amount of a civil penalty.' "  *Ward* v. *Coleman,* 598 F. 2d 1187, 1193 (CA10 1979).

I agree with the Court of Appeals that, under these circumstances, application of the factors set forth in *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, leads to the conclusion that the penalty is a criminal sanction rather than a purely regulatory measure.

That is not the end of the inquiry, however.  A reporting requirement is not necessarily invalid simply because it may incriminate a few of the many people to whom it applies. Two examples from the tax field will illustrate my point. As this Court held in *Marchetti* v. *United States,* 390 U. S. 39, and *Grosso* v. *United States,* 390 U. S. 62, statutes that are plainly designed to obtain information from a limited class of persons engaged in criminal activity in order to facilitate their prosecution and conviction are invalid under the Fifth Amendment.  On the other hand, when the general income tax laws require a full reporting of each taxpayer's income in order to fulfill the Government's regulatory objectives, the fact that a particular answer may incriminate a particular taxpayer is not a sufficient excuse for refusing to

---

[1] An owner or operator is liable for cleanup costs or, in the event that the discharge is "nonremovable," for liquidated damages under 33 U. S. C. § 1321 (b) (2) (B) (i) and § 1321 (f).  As the Court of Appeals noted, payment of these damages does not relieve the owner or operator of liability for civil penalties under § 311 (b) (6).  *Ward* v. *Coleman,* 598 F 2d 1187, 1191 (CA10 1978).

supply the relevant information required from every tax-payer.  See *United States* v. *Oliver,* 505 F. 2d 301, 307–308 (CA7 1974).[2]

Thus, given that the statutory penalty in this case is a criminal sanction, the issue becomes what the primary purpose of requiring the citizen to report oil spills is.  If it is to simplify the assessment and collection of penalties from those responsible, it should fall within the reasoning of *Marchetti* and *Grosso.*  On the other hand, if the requirement is merely to assist the Government in its cleanup responsibilities and

---

[2] As I suggested in *Oliver*:

"The enactment of special legislation designed to procure incriminating disclosures from a select group of persons engaged in criminal conduct was tantamount to an accusation commencing criminal proceedings against them.  The statutory demand to register as a gambler was comparable to the inquisitor's demand that a suspect in custody admit his guilt.  The admission, once made, would almost inevitably become a part of the record of a criminal proceeding against a person who had already been accused when he confessed. . Just as the *Miranda* decision may be read as having enlarged the adversary proceeding to commence when the accused is first taken into custody, *Marchetti* and comparable cases have, for Fifth Amendment purposes, treated special statutes designed to secure incriminating information from inherently suspect classes of persons as the commencement of criminal proceedings against those from whom incriminating information is demanded.  Under this analysis, we must test the applicability of the Fifth Amendment to a self-reporting statute at the time that disclosure is compelled.

"The statute which defendant Oliver is accused of violating is applicable to the public at large, and its demands for information are neutral in the sense that they apply evenly to the few who have illegal earnings and the many who do not.  The self-reporting requirements of the Internal Revenue Code are justified by acceptable reasons of policy, entirely unrelated to any purpose to obtain incriminating evidence against an accused person or group.  Therefore, even though the disclosure of defendant's illegal income was compelled by statute, and even though we assume that such disclosure might well have been incriminating, the *Marchetti* holding does not justify the conclusion that the Fifth Amendment excuses defendant's obligation to report his entire income."  (Footnotes omitted.)  505 F. 2d, at 307–308.

in its efforts to monitor the conditions of the Nation's waterways, it should be permissible. Although the question is again a close one, the automatic nature of the statutory penalty, which *must* be assessed in each and every case, convinces me that the reporting requirement is a form of compelled self-incrimination.[3]  I therefore respectfully dissent.

---

[3] As a result, I would hold that the Government could not use a report filed by an individual owner or operator in assessing a civil penalty under § 311 (b) (6). However, I believe the Government could still use such a report in assessing damages under either § 311 (b) (2) (B) (i) or § 311 (f), see n. 1, *supra,* since penalties assessed under those subsections are regulatory rather than punitive in character.