# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-4274
_____

United States of America,

        Appellee,

v.

Martin D. Perry,

        Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Nebraska.
\*
\*
\*

_____

Submitted: April 14, 1998

Filed: August 17, 1998
_____

Before WOLLMAN, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Martin D. Perry appeals from his conviction in district court[1] for conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 371, 1341, and 1343. We affirm.

_____

[1]The Honorable William G. Cambridge, Chief Judge, United States District Court for the District of Nebraska.

# I.

Perry, a resident of Virginia, was the chief executive officer of Malachi Marketing Group (Malachi), a multi-level marketing program headquartered in Virginia Beach, Virginia. Malachi's president was Gordon Whitten, a Nebraska resident. William Fritz, also a Nebraska resident, promoted programs on behalf of Malachi. In the spring of 1990, Perry and Fritz began discussing the possibility of developing a bank that would benefit Malachi's representatives. As the plan evolved, their discussions resulted in a scheme that, as the familiar caveat says, would appear too good to be true. Ultimately, the caveat proved correct.

The three men began telling Malachi's prospective sales representatives that the bank would enable them to retire large mortgage loans at less than face value. In the succeeding weeks, Fritz began to tell Whitten that the bank had in fact been established. Whitten later learned that the bank was located on the Sac Fox Indian Reservation near Cushing, Oklahoma. Meanwhile, during a number of seminars, Perry, Fritz, and Whitten enticed prospective members with claims that Malachi members who purchased silver coins could have their coins shipped to a bonded warehouse on reservation land and afterwards use the silver as collateral to obtain credit at the bank. An umbrella trust called the Precious Metals Cooperative Trust (the trust) was supposed to contract with the bank to facilitate these transactions. Members of the trust who purchased family estate trusts and deposited a qualifying number of silver coins into the bank were eligible for "debt restructuring."

The men claimed that debt restructuring enabled trust members to obtain loans from the bank and use those funds to pay off their existing mortgage debt. The borrowers would then purportedly pay off their loans for an amount much less than face value. Some members were informed, for instance, that they could pay a $100,000 loan off in seven years with total repayments, including principal and interest, of approximately $42,000.

Fritz concluded that the bank's initial capitalization would require approximately $250,000. He devised a plan to raise the money by which "charter members" would lend $25,000 to the trust in exchange for even more advantageous debt restructuring. This plan was later modified to enable groups of five members to put up $5,000 each to become charter members. Prospective charter members were led to believe that the trust would repay these loans within one year and that they would be entitled to pay off their mortgage debt at approximately 22 percent of face value.

Between July and late November of 1990, Perry and his associates persuaded 78 persons to lend the trust a total of approximately $470,000. Although they told members that the bank would be operational as early as September of 1990, the men later claimed that many problems were delaying the commencement of operations. In April of 1991, a newsletter was sent to members that stated that debt restructuring was about to commence and that charter members would soon be reaping the benefits of their loans.

Inevitably, the house of cards collapsed. No debt restructuring was ever undertaken. Only one of the charter members was repaid. Investigators later determined that the bank had never existed and that authorities on the Sac Fox Reservation had never entered any agreements with the trust. Most of the loan funds were evidently deposited into a Nebraska account held by Fritz and later transferred by the trust to Perry's control in Virginia in the guise of loans to Malachi. Evidence suggested that Perry and Malachi received approximately $344,000 from these transfers.

On December 13, 1995, Perry and Fritz were indicted for conspiracy to commit mail and wire fraud.[2] Because of Fritz's failing health, the charges against him were

---

[2]Whitten was neither charged in the conspiracy nor did he enter into a plea agreement with the government. The government apparently made this decision after

severed from those against Perry, and the case against Fritz has been continued indefinitely. Perry was eventually tried and convicted. He was sentenced to a thirty-month prison term and ordered to pay restitution in the amount of $446,725.

## II.

On appeal, Perry argues that he was the target of selective prosecution and that the district court erroneously denied him an evidentiary hearing on the matter. We review the court's decision for clear error. See United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996). To establish a *prima facie* case claim of selective prosecution, Perry must demonstrate that others similarly situated to him were not prosecuted and that the decision to enforce the law against him was motivated by discriminatory purpose. See United States v. Armstrong, 517 U.S. 456, 465-66 (1996); Bell, 86 F.3d at 823. To be entitled to discovery on his claim, Perry must present some evidence that tends to show the existence of both elements. See Armstrong, 517 U.S. at 468-69. "The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such claim." Id. at 468.

Perry, who is black, argues that the government's failure to indict Whitten and its failure to proceed with Fritz's prosecution, both of whom are white, were adequate evidence to warrant an evidentiary hearing. We disagree. The government acted well within its discretion in crediting Whitten's claims that he was an innocent pawn in Perry and Fritz's scheme. See id. at 464. Fritz himself was indicted, and only his ill health prevents his trial from going forward. We reject Perry's unsupported allegation that Fritz's illness is feigned. In light of Perry's inadequate showing of discriminatory effect, coupled with his inability to produce any evidence of discriminatory purpose,

concluding that Whitten, who maintained the naive belief that debt restructuring would work, was an unwitting facilitator to the scheme.

-4-

we conclude that the district court did not commit clear error in rejecting Perry's claim of selective prosecution.

On October 12, 1993, in a civil action brought by the Securities and Exchange Commission (SEC), Perry, Fritz, and Whitten were found to be in violation of federal securities laws. The default judgment enjoined the defendants from further violations and held the men jointly and severally liable for the disgorgement of all profits gained from sales or offers to sell interests in the trust. The judgment, including illegal profits and prejudgment interest, totaled $347,117.06. Contending that the order was punitive, Perry argues that his conviction in the present case was a violation of the Double Jeopardy Clause of the Fifth Amendment. To resolve this contention, we must first consider "whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" Hudson v. United States, 118 S. Ct. 488, 493 (1997) (quoting United States v. Ward, 448 U.S. 242, 248 (1980)). If it is determined that the legislature has indicated an intention to establish a civil sanction, the question then becomes whether the "statutory scheme was so punitive either in purpose or effect," as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty." Hudson v. United States, 118 S. Ct. at 493 (citations omitted); see Rex Trailer Co. v. United States, 350 U.S. 148, 154 (1956).

In Securities & Exch. Comm'n v. Palmisano, 135 F.3d 860 (2d. Cir. 1998), the Second Circuit was faced with a similar double jeopardy challenge to an SEC disgorgement order. Applying the Hudson test, the Palmisano court held that the disgorgement remedy was not a criminal punishment and thus did not implicate the Double Jeopardy Clause. Concluding that Congress intended disgorgement to be a civil remedy, the court observed that "[t]he disgorgement remedy, which has long been upheld as within the general equity powers granted to the district court . . . has not been considered a criminal sanction." Id. at 865-66 (citations omitted). The court then considered whether the punitive purpose or effect of disgorgement was sufficient to override Congress's intent. In holding that it did not, the court noted that: (1) the

payment of monetary sums has traditionally been considered a civil sanction; (2) monetary sanctions do not implicate an "affirmative disability or restraint"; and (3) disgorgement serves several nonpunitive goals. Id. (quoting Hudson, 118 S. Ct. at 496).

We find the Second Circuit's analysis persuasive. We join it and the several other circuits that have held that the SEC disgorgement remedies are not criminal punishments. See id. at 866; United States v. Gartner, 93 F.3d 633, 635 (9th Cir. 1996); Securities & Exch. Comm'n v. Bilzerian, 29 F.3d 689, 696 (D.C. Cir. 1994); United States v. Rogers, 960 F.2d 1501, 1507(10th Cir. 1992). Thus, we conclude that Perry's conviction in this action does not violate the Double Jeopardy Clause.

Perry contends that the district court thus erred in ordering him to pay restitution in the amount of $466,725. District courts are authorized to order the defendant to make restitution to "any victim of such offense." 18 U.S.C. § 3663(a)(1). "Amount of loss is a factual determination that we review only for clear error." United States v. French, 46 F.3d 710, 715 (8th Cir. 1995). The government carries the burden to prove the amount of loss. See id. at 716. The district court was presented with ample evidence to support the restitution order. Whitten testified that as much as $470,000 was raised from charter members. Douglas Czepa, a United States Postal Inspector, testified that as much as $462,000 had been funneled into accounts controlled by Fritz, one of Perry's co-conspirators. The district court was also authorized to base its loss calculations on Perry's presentence investigation report. The report included a detailed list of the victims and their losses totaling $471,725. After subtracting $25,000 from this total to reflect the repayment that had been made to one victim, the district court set restitution in the amount of $446,725. We find no error in the court's calculations.

We reject Perry's argument that he was entitled to a transfer of venue to the Eastern District of Virginia pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure. The district court exercised its sound discretion to deny the transfer, given

that: (1) the government's chief witnesses and most of Perry's victims resided in Nebraska; (2) the bulk of the investigative work was done in Nebraska; (3) most of the records used in the case were in Nebraska; (4) the PM Coop Trust was administered in Nebraska; and (5) at the time of Perry's motion for change of venue, Fritz, a Nebraska resident, was still his co-defendant. See United States v. Green, 983 F.2d 100, 103 (8th Cir. 1992).

Perry contends that the district court erroneously denied his motion to dismiss based upon an alleged violation of the Sixth Amendment and the Jury Selection and Service Act, 28 U.S.C. § 1861, *et seq.* He makes a largely unsupported argument that the District of Nebraska's use of voter registration lists, rather than driver's license lists, results in the underrepresentation of blacks in jury pools. We have consistently approved the use of voter registration lists to select jury pools. See United States v. Garcia, 991 F.2d 489, 492 (8th Cir. 1993); see also United States v. Einfeldt, 138 F.3d 373, 379 (8th Cir. 1998); Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996). "The mere fact that one identifiable group of individuals votes in a lower proportion than the rest of the population does not make a jury selection system illegal or unconstitutional." United States v. Clifford, 640 F.2d 150, 156 (8th Cir. 1981). Perry's claim therefore lacks merit.

Perry's next argument is that his prosecution was time-barred under 18 U.S.C. § 3282 because he was indicted more than five years after the fraudulent scheme was completed. When a defendant is charged with conspiracy, as here, the limitations period commences "from the occurrence of the last overt act committed in furtherance of the conspiracy." United States v. Dolan, 120 F.3d 856, 864 (8th Cir. 1997). Mailings designed to "lull the victims into a false sense of security" and hide a fraudulent scheme are considered an overt act in furtherance of a conspiracy. United States v. Lane, 474 U.S. 438, 451 (1986); see also United States v. Wrehe, 628 F.2d 1079, 1083 (8th Cir. 1980).

Perry, who was indicted on December 13, 1995, contends that the conspiracy ended sometime before December 13, 1990, when the last of the charter members' money reached Malachi. However, the district court was presented with ample evidence to demonstrate that the conspiracy continued well into 1991. Charter members were mailed "lulling" letters on at least two different occasions during that year. Perry also stipulated that money from Fritz's account was wired to his Virginia accounts as late as May 8, 1991. Accordingly, we conclude that Perry's indictment is not time-barred.

Having examined the remaining issues raised by Perry, we conclude that they lack merit and warrant no further discussion.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.