Judge LIVINGSTON dissents in a separate opinion.
WESLEY, Circuit Judge:
Petitioner-Appellant Robert Nowakow-ski was convicted of harassment in the second degree, an offense classified as a violation under state law, and sentenced to one year’s conditional discharge, requiring one day of community service. Before completing this sentence, Nowakowski filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York (Vitaliano, /.). Because Nowakowski fulfilled the requirements of his sentence during the pendency of the habeas proceeding, the District Court concluded that Nowakowski’s case presented no live ease or controversy sufficient to establish Article III standing under Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).
We granted a certificate of appealability with instructions to brief two questions of first impression we now answer: First, whether a sentence of conditional discharge and one day’s community service, unfulfilled as of the time of filing the ha-beas petition, satisfies the “in custody” requirement of § 2254. And second, whether a presumption of continuing collateral consequences applies to Nowakowski’s conviction, thus presenting a live case or controversy under Article III despite the expiration of his sentence. Because we answer both questions in the affirmative, we VACATE the District Court’s dismissal of Nowakowski’s petition and REMAND for further proceedings consistent with this opinion.[1]
*214 BACKGROUND[2]
Robert Nowakowski was arrested on October 31, 2006, on charges of assault against another tenant in his building. He contends that these charges were fabricated by his landlord and his neighbors, including the now-deceased victim. After a bench trial, he was convicted of harassment in the second degree — which is classified' as a violation under New York state law — in the Criminal Court of the City of New York on September 18, 2008, and ordered to pay a fine of $100. The sentence was stayed for over four years during post-conviction appeals and collateral proceedings. On May 14, 2013, the Criminal Court vacated the fíne and sentenced No-wakowski to a one-year conditional discharge, requiring him to complete one day of community service within that time. This change in sentence occurred at Nowa-kowski’s request because he could not afford the fine and administrative charges, which totaled $195.
Pursuant to the amended sentence, the Kings County District Attorney’s Office sent Nowakowski a “Notice of C.S. Obligation,” dated June 6, 2013. This notice informed Nowakowski that he had been referred for community service on July 2, 2013, with the Parks Department. It informed him that he was required to appear on that date in a specific location, that the .date would “NOT be rescheduled,” and that if he failed to appear or complete the required service, “a warrant may be issued for [his] arrest.” Appellant App. 18.[3]
On July 1, 2013, Nowakowski filed a petition under 28 U.S.C. § 2254 for habeas relief. He then appeared and completed his community service before appearing in the Criminal Court on July 9, 2015, with proof of completion.[4] Prior to filing his federal habeas petition, Nowakowski had filed a pro se civil complaint in the United States District Court for the Eastern District of New York, alleging violations of 42 U.S.C. § 1983 by arrest and imprisonment without probable cause, assault and excessive force, and the state tort of malicious abuse of process. See Second Am. Compl., Nowakowski v. City of New York et al., No. 1:08-cv-00399-RJD-LB (E.D.N.Y. filed May 19, 2008), ECF No. 17. His civil action remains stayed pending resolution of his federal habeas proceeding.
On November 7, 2013, the District Court initially dismissed Nowakowski’s petition without prejudice, because it contained an unexhausted claim of ineffective assistance of appellate counsel. Nowakowski both moved to vacate the dismissal, stating he wished to delete his unexhausted claim and proceed only on his exhausted claims, and filed a motion in our Court for a certificate of appealability. We construed the motion as one for remand to the District Court for consideration of his Rule 59(e) motion and *215 granted it. On April 2, 2014, the District Court reopened Nowakowski’s case and granted Nowakowski’s motion for reconsideration, allowing his exhausted claims to proceed.
Following briefing, the District Court concluded that the expiration of Nowakow-ski’s conditional discharge on May 14, 2014, rendered his petition moot, unless Nowakowski could demonstrate a continuing collateral consequence under Spencer, supra. Nowakowski argued that his conviction would preclude his § 1983 action from proceeding under Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); the District Court held that Spencer rejected this argument against mootness as an insufficient collateral consequence. Thus, the District Court entered a Memorandum and Order on May 30, 2014, dismissing the petition as moot and denying a certificate of appealability. Nowakow-ski moved for a certificate of appealability in this Court, which we granted. See Order, Nowakowski v. New York, No. 14-1964 (2d Cir. Dec. 8, 2014), ECF No. 21.
DISCUSSION
We review de novo a district court’s denial of a § 2254 petition, including whether a petitioner was in custody at the time of filing, see Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011), and whether his petition is moot, Marrero Pichardo v. Ashcroft, 374 F.3d 46, 50-51 (2d Cir. 2004). As Nowakowski briefed and argued this case pro se, we construe his “appellate briefs and submissions liberally and interpret them to raise the strongest arguments they suggest.” Wright v. Comm’r, 381 F.3d, 41, 44 (2d Cir. 2004).

I.

The first question we must decide is whether Nowakowski was “in custody” and thus able to seek federal habeas relief.[5] In order for a federal court to have jurisdiction over a habeas petition, the petitioner must be “in custody pursuant to the judgment of a State court” at the time the petition is filed. 28 U.S.C. § 2254(a); Maleng v. Cook, 490 U.S. 488, 490-91, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989).
Despite the “chief use of habeas” being “the release of persons held in actual, physical custody in prison or jail,” the Supreme Court has affirmed “that, besides physical imprisonment, there are other restraints on a man’s liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.” Jones v. Cunningham, 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); see also id. at 238, 83 S.Ct. 373. The Jones Court found jurisdiction where an individual was released from imprisonment on parole subject to explicit conditions — for example, regular reporting to his parole officer; remaining in a particular community, residence, and job; and refraining from certain activities. Id. at 242, 83 S.Ct. 373. The Supreme Court has likewise found jurisdiction where a petitioner was released on his own recognizance prior to trial but had to appear in criminal court when ordered and where failure to do so would result in issuance of an arrest warrant. See Hensley v. Mun. Court, San Jose-Milpitas Judicial Dist., 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); see also Justices of Bos. Mun. Court v. Lydon, 466 U.S. 294, 300-01, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (finding juris *216 diction over petitioner released on his own recognizance prior to trial “subject to the conditions that he would appear when ordered by the court, that he would waive extradition if he was apprehended outside the State, and that a court could revoke the order of release and require that he be returned to confinement or post bail”).
The Courts of Appeals, including ours, have recognized that a variety of noncon-finement restraints on liberty satisfy the custodial requirement. See, e.g., Earley v. Murray, 451 F.3d 71, 75 (2d Cir. 2006) (post-release supervision); Barry v. Bergen Cty. Prob. Dep’t, 128 F.3d 152, 160-62 (3d Cir. 1997) (500 hours of community service); Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 894-95 (2d Cir. 1996) (banishment from tribal land); Dow v. Circuit Court of First Circuit Through Huddy, 995 F.2d 922, 923 (9th Cir. 1993) (per curiam) (mandatory fourteen-hour alcohol rehabilitation program); Sammons v. Rodgers, 785 F.2d 1343, 1345 (5th Cir. 1986) (per curiam) (unexpired suspended sentence); United States ex rel. B. v. Shelly, 430 F.2d 215, 217 n.3 (2d Cir. 1970) (probation). Those cases where courts have declined to find the petitioners sufficiently “in custody” have typically involved the imposition of fines or civil disabilities, such as suspension of licenses. See, e.g., Barnickel v. United States, 113 F.3d 704, 706 (7th Cir. 1997) (restitution); United States v. Michaud, 901 F.2d 5, 7 (1st Cir. 1990) (per curiam) (monetary fine); Lefkowitz v. Fair, 816 F.2d 17, 20 (1st Cir. 1987) (suspension of medical license); Lillios v. New Hampshire, 788 F.2d 60, 61 (1st Cir. 1986) (per curiam) (fine and temporary suspension of driver’s license); Ginsberg v. Abrams, 702 F.2d 48, 49 (2d Cir. 1983) (per curiam) (revocation of law, real estate, and insurance licenses); see also Maleng, 490 U.S. at 492, 109 S.Ct. 1923 (collateral consequences of a completed sentence do not constitute custody).
The custody inquiry therefore “requires a court to judge the ‘severity’ of an actual or potential restraint on liberty.” Poodry, 85 F.3d at 894. Though the language of habeas eases often refers to “severe restraints on individual liberty” or “cases of special urgency,” Hensley, 411 U.S. at 351, 93 S.Ct. 1571, these terms describe the nature, rather than the duration, of the restraint. It is evident that a single day of incarceration would be sufficient custody for jurisdiction if the petitioner filed while subject to such a sentence. Similarly, courts have considered even restraints on liberty that might appear short in duration or less burdensome than probation or supervised release severe - enough because they required petitioners to appear in certain places at certain times, thus preventing them from exercising the free movement and autonomy available to the unrestricted public, or exposed them to future adverse consequences on discretion of the supervising court.'See id. (custody satisfied where petitioner was required to appear in court when ordered and subject to revocation 'of release); Barry, 128 F.3d at 161 (despite flexibility in scheduling, requirements “to be in a certain place— or in one of several places — to attend meetings or to perform services” are clearly “restraints on [petitioner’s] liberty not shared by the public generally”); Dow, 995 F.2d at 923 (mandatory class attendance and “physical presence at a particular place” constituted custody, despite lasting only fourteen hours over three days); Sammons, 785 F.2d at 1345 (potential of revocation of suspended sentence or other adverse action during term sufficient for custody).
With these examples in mind, we turn to the facts before us, which are uncontested. Although the Criminal Court ini *217 tially imposed a fine of $100, it vacated this sentence and replaced it with a one-year ' conditional discharge and an order that Nowakowski perform one day of community service. At the time of the petition’s filing, therefore, the Criminal Court required Nowakowski (1) to complete a day of community service (2) by a particular date and (3) to report to the Criminal Court upon completion of that service. Pursuant to these requirements, Nowa-kowski received a “Notice of C.S. Obligation” from the Kings County District Attorney. The Notice commanded that Nowakowski appear at a particular location at a particular time on a particular day, and informed him that he had no opportunity to reschedule the date and that failure to appear could result in the issuance of a bench warrant. In addition, during the one-year term of his sentence — which lasted for nine months after his petition was filed — the Criminal Court retained jurisdiction to modify or enlarge the conditions of, or to revoke entirely, the conditional discharge. See N.Y. PENAL Law § 65.05[2],
Nowakowski’s sentence falls within the category of restraints that satisfy the statutory requirement of custody.[6] These restrictions are “not shared by the public generally,” Jones, 371 U.S. at 240, 83 S.Ct. 373, require Nowakowski’s physical presence at particular times and locations, both for community service and court appearances, see Barry, 128 F.3d at 161; Dow, 995 F.2d at 923, and carry with them the potential for future adverse consequences during the term of the sentence, including arrest for noncompliance and modification or revocation of the conditional discharge [7] see Hensley, 411 U.S. at 351, 93 S.Ct. 1571; Sammons, 785 F.2d at 1345. They are wholly unlike the economic penalties suffered in fine-only or license-revocation sentences, where the punishments “implicate only property, not liberty.” Barry, 128 F.3d at 161. Consequently, we conclude that, at the time the petition was filed, Nowakowski was “in custody” within the meaning of § 2254.
II.
The second question we must answer is whether Nowakowski’s case is moot. Unlike the “in custody” requirement, mootness is not fixed at the time of filing but must be considered at every stage of the habeas proceeding. See Carafas v. La-Vallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). Once, as here, a petitioner’s sentence has expired, “some con- *218 Crete and continuing injury other than the now-ended incarceration or parole — some ‘collateral consequence’ of the conviction— must exist if the suit is to be maintained.” Spencer, 523 U.S. at 7, 118 S.Ct. 978. In Spencer, the Court conducted a two-step analysis: First, the Court determined whether a presumption of “continuing collateral consequences” should apply. Id. at 8, 118 S.Ct. 978. And second, the Court determined whether, applying the presumption or not, there was sufficient evidence that such consequences in fact existed. Id. at 14, 118 S.Ct. 978; accord United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999). We conduct each inquiry in turn.
A.
Spencer traced more than forty years of Supreme Court precedent to explain the development of the presumption of continuing collateral consequences after its first articulation in Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The Court observed that it applied the presumption only to “criminal convictions” and expressly declined to extend it outside of that context to parole revocation. Spencer, 523 U.S. at 9-13, 118 S.Ct. 978; see also Lane v. Williams, 455 U.S. 624, 632-33, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982). In so doing, it candidly acknowledged that such a presumption “sits uncomfortably beside the long-settled principle” that Article III standing cannot be inferred and that the proponent of jurisdiction bears the burden of demonstrating it. Spencer, 523 U.S. at 10-11, 118 S.Ct. 978 (internal quotation marks omitted). It further considered “of particular relevance” that, with criminal convictions, “the presumption of significant collateral consequences is likely to comport with reality,” calling this observation “‘an obvious fact of life.’ ” Id. at 12, 118 S.Ct. 978 (quoting Sibron, 392 U.S. at 55, 88 S.Ct. 1889). The Court’s clear reluctance to extend the Si-bron presumption outside of this narrow category has guided our Court in declining to apply it when the defendant does not challenge a criminal conviction. See Mercurris, 192 F.3d at 293 (sentencing enhancement); United States v. Probber, 170 F.3d 345, 348 (2d Cir. 1999) (revocation of supervised release).
Spencer — as well as our opinions in Mer-curris and Probber — may be fairly characterized as declining to apply the presumption to cases in which,something ancillary to a conviction was challenged, even if of a criminal nature.[8] Here, by contrast, it is evident that Nowakowski challenges a conviction. What is disputed is whether this conviction is criminal, for reasons that will shortly become clear. Our Circuit’s precedent has never answered this question, nor has the Supreme Court spoken on the subject in the context of the Sibron presumption. Therefore, we proceed cautiously, examining the nature of the offense of which Nowakowski was convicted and drawing on principles in other areas of law where the Supreme Court has addressed similar considerations.
Before commencing our analysis, we think it necessary to explain briefly the New York scheme of penal offenses. The New York Penal Law defines an “offense” as “conduct for which a sentence to a term of imprisonment or to a fine is provided” by a state or local law, ordinance, or regulation. N.Y. Penal Law § 10.00[1]. The Penal Law categorizes each offense as one of four types, listed here in descending order of seriousness: a felony, a misdemeanor, a violation, and a traffic infraction. Id. *219 § 10.00[2]-[5]. Of these four, only a felony and a misdemeanor are labeled “[c]rime[s].” Id. § 10.00[6]. Violations are offenses, other than traffic infractions, “for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed.” Id. § 10.00[3]. Misdemeanors permit incarceratory sentences of up to one year, while felonies permit incarcera-tory sentences over one year. Id. § 10.00[4]-[5]. Traffic infractions are violations of the Vehicle and Traffic Law, “which [are] not declared by this chapter or other law of this state to be a misdemeanor or a felony.” N.Y. Veh. & Traf. Law §155.
In the case before us, Nowakow-ski was convicted of harassment in the second degree, which New York classifies as a violation. See N.Y. Penal Law § 240.26. Thus, the critical question is whether, taking into account New York’s decision not to label violations as crimes, Nowakowski’s conviction is nonetheless “criminal” for purposes of the Sibron presumption.
We start from first principles. The Sibron presumption is a judicial doctrine concerning mootness under Article III. See Liner v. Jafco, Inc., 375 U.S. 301, 304, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). Whether a case is moot is a question of federal, not state, law. See id. As a result, we must determine whether Nowakowski’s conviction is civil or criminal in nature by reference to federal principles — state law provides the necessary facts underlying the question, but federal law provides the rule of decision. See, e.g., United States v. Juvenile Male, 564 U.S. 932, 131 S.Ct. 2860, 2864, 180 L.Ed.2d 811 (2011) (per curiam) (analyzing a certified question of Montana law to determine whether the doctrine of continuing collateral consequences was satisfied). For several reasons, we think the Supreme Court’s cases determining the applicability of federal constitutional protections are the most relevant precedents upon which to draw. See, e.g., Kennedy v. Mendoza-Martinez, 372 U.S. 144, 165-68, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (concluding constitutional criminal protections apply where Congress applies a punitive sanction); see also, e.g., Allen v. Illinois, 478 U.S. 364, 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (conducting same analysis with respect to sanctions imposed by state law).
First, the inquiries are identical in the question presented: whether a particular proceeding is civil or criminal in nature under federal law. See Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 630, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (endorsing “the characterization of this proceeding and the relief given as civil or criminal in nature, for purposes of determining the proper applicability of federal constitutional protections” as raising “a question of federal law rather than state law”). And second, both the civil-criminal analysis and the Sibron presumption are judicially created doctrines that give effect to constitutional requirements. See Kennedy, 372 U.S. at 167-68, 83 S.Ct. 554; Sibron, 392 U.S. at 50, 88 S.Ct. 1889. Consequently, we see no reason why, if Nowakowski’s conviction is “criminal” for purposes of federal constitutional protections, it should not be criminal' for purposes of the Sibron presumption,[9] and so we apply the former analysis here.
The Supreme Court has observed that “[t]he categorization of a particular proceeding as civil or criminal is first of all *220 a question of statutory construction.” Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (internal quotation marks omitted). In construing statutes, we endeavor to “determine the legislative objective” — ie., to establish either a civil regulatory penalty or a criminal punishment. Smith v. Doe, 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). We start with the fact that New York does not formally classify violations as “crimes.” See N.Y. Penal Law § 10.00[6]. Where a legislature has expressly designated a sanction as “civil,” that may in some cases suffice to demonstrate evidence of intent. See Allen, 478 U.S. at 368, 106 S.Ct. 2988 (describing an express label of a proceeding as “civil” as indicating the state’s intent “to proceed in a nonpunitive, noncriminal manner”); United States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (observing Congress labeled a particular sanction as a “civil penalty”). Here, rather than identifying violations or their attendant sanctions as civil in nature, New York has merely excluded them from the classification of “crime.”[10] In a case concerning the Ex Post Facto Clause, where Alaska’s sex offender registration statute was neither explicitly denoted as civil nor criminal, the Supreme Court looked to the purposes of the law as articulated in its text, as well as “[o]ther formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes.” Smith, 538 U.S. at 93-94, 123 S.Ct. 1140.
The reasons for applying a functional approach are clear. States have widely varying designations of offenses under their penal codes, and these designations subject defendants to different ranges of punishment. For example, elsewhere in our Circuit, Connecticut declines to designate “violations” as crimes,[11] while Vermont has no violations and instead labels all offenses in its penal code as felonies or misdemeanors. Compare Conn. Gen. Stat. § 53a-24(a), with Vt. Stat. Ann. tit. 13, § 1. While New York violations can result in fifteen-day imprisonment, Connecticut violations result only in fines. Compare N.Y. Penal Law § 10.00[3], with Conn. Gen. Stat. § 53a-27(a). The maximum incarcera-tory sentence for misdemeanors is one year in New York and Connecticut but two years in Vermont. Compare N.Y. Penal Law § 10.00[4], and Conn. Gen. Stat. § 53a-26(a), with Vt. Stat. Ann. tit. 13, § 1. Such variances counsel against adopting a purely labels-dependent approach to our analysis. If we were to do otherwise, federal jurisdiction over habeas petitions arising from similar or identical conduct and punishment would be controlled by vagaries of nomenclature, not substance.
Adopting the approach of the Smith Court, we examine New York’s penal code and laws regarding Nowakowski’s conviction as a whole, giving due weight to the State’s legislative judgments. We conclude that New York punishes violations such as Nowakowski’s under its criminal, not civil, authority. An action to prosecute a violation is designated a “criminal action” under New York law and may be commenced by filing an information or prosecutor’s information, see N.Y. CRiM. PROC. Law § 1.20[4], [6], [16], which are instruments that “constitute[ ] an accusation on behalf of the state as plaintiff,” id. § 1.20[1]. Such *221 actions are governed by the New York Criminal Procedure Law, see id. § 1.10[l](a), which requires the State to prove guilt beyond a reasonable doubt, see id. §' 70.20. These are all customary indicia of the State’s exercise of criminal jurisdiction.
Our understanding that Nowakowski’s conviction was secured pursuant to New York’s criminal authority accords with traditional conceptions of the distinction between criminal and civil jurisdiction:
The distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this: that private wrongs, or civil injuries, are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals; public wrongs, or crimes and misdemeanors, are a breach and violation of the public rights and duties, due to the whole community, considered as community, in its social aggregate capacity.
2 William BlacicstoNe, COMMENTARIES on the Laws of England, bk. 4, ch. 1, at 5 (1st ed. 1769). Harassment in the second degree is conduct that New York seems to view as a public wrong and wishes to punish in its social aggregate capacity. See N.Y. Penal Law, art. 240 (designated “Offenses Against Public Order” and including harassment in the second degree); cf. Smith, 538 U.S. at 94, 123 S.Ct. 1140 (observing that codification in the criminal code may constitute some evidence of punitive intent). Thus, the New York statutory scheme evinces an intent to treat a violation as criminally sanctionable conduct, notwithstanding the formal designation of only misdemeanors and felonies as “crimes.”
In the context of federal constitutional protections, a conclusion that the state legislature intended a criminal punishment ordinarily “ends the inquiry.” Smith, 538 U.S. at 92, 123 S.Ct. 1140. However, the Supreme Court has also developed a set of factors that are “neither exhaustive nor dispositive, but are useful guideposts” for determining whether a statutory penalty is criminal or civil in nature, even where a legislature’s intent is to impose civil penalties. Id. at 97, 123 S.Ct. 1140 (citations and internal quotation marks omitted).[12] These factors, first announced in Kennedy v. Mendoza-Martinez, supra, are as follows:
[ 1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment — retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears. excessive in relation to the alternative purpose assigned.
372 U.S. at 168-69, 83 S.Ct. 554 (footnotes omitted). The Supreme Court has instructed that “[ajbsent conclusive evidence of [legislative] intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face.” Id. at 169, 83 S.Ct. 554.
However, here, as in Kennedy, “the objective manifestations of [legislative] purpose indicate conclusively that the provi *222 sions in question can only be interpreted as punitive,” and therefore, “a detailed examination along such lines is unnecessary.” Id.; see also Smith, 538 U.S. at 92-93, 123 S.Ct. 1140. Nonetheless, for the sake of thoroughness and to .assure ourselves of the soundness of our ultimate conclusion, we briefly address these factors in the context before us.[13]
The first three factors easily weigh in favor of finding this violation criminal in nature. As discussed above, a conviction exposes a defendant to an incarceratory sentence of up to fifteen days. Of course, imprisonment is “the paradigmatic affirmative disability or restraint,” Smith, 538 U.S. at 100, 123 S.Ct. 1140, and thus incontrovertibly considered punishment. In addition, conviction requires proof of scienter beyond a reasonable doubt — namely, “intent to harass, annoy or alarm another person.” N.Y. Penal Law § 240.26; see also N.Y. CRiM. PROC. Law § 70.20. The fourth factor similarly weighs in favor of considering the conviction criminal: the statute clearly operates to deter bad conduct, and the possible punishments serve retribution on offenders. The fifth factor is not particularly appropriate to this context — the criminality, or not, of Nowakowski’s conduct is established by this statute in its own right.
The final two factors — the existence of a rational alternative purpose and whether the sanction is excessive in relation to it— do not appear to weigh in favor of finding the sanction civil. As the analysis of factors one, three, and four show, the principal effect of the sanctions here is punitive— imprisonment, monetary fines, or both— and do not appear to have an alternate purpose that contributes to a regulatory or civil interest of the state. For example, the Supreme Court concluded in Smith that sex offender registration served a nonpuni-tive civil purpose: “public safety, which is advanced by alerting the public to the risk of sex offenders in their community.” 538 U.S. at 103, 123 S.Ct. 1140 (alteration and internal quotation marks omitted). No analogous civil interest immediately rises to mind on the law before us, but we need not conclusively decide the question in light of the weight of the other factors.
In summáry, we conclude that Nowa-kowski’s conviction is criminal in nature for the purposes of invoking the Sibron presumption.[14] We do so primarily because New York has evinced a legislative intent to treat such convictions as criminal, and such intent is supported by our consideration of the Kennedy factors.
B.
Having concluded the presumption of continuing collateral consequences should apply, we now turn to whether sufficient collateral consequences to Nowakowski’s conviction have been demonstrated. Because Nowakowski’s conviction was based on one of the lowest level offenses under state law, we think it is likely that he will suffer fewer collateral consequences than if convicted of a felony or even a misde *223 meanor. Thus, as his case may end up being on the margins, we think it useful to examine how the presumption will functionally affect our inquiry.
First, Spencer defined the Supreme Court’s application of the principle as being “willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur).” 528 U.S. at 8, 118 S.Ct. 978. This approach has led the Court “to accept the most generalized and hypothetical of consequences as sufficient to avoid mootness in challenges to conviction.” Id. at 10, 118 S.Ct. 978. Spencer used two hypothetical possibilities that a previous decision had deemed sufficient to avoid mootness: “the possibility that the conviction would be used to impeach testimony [a defendant] might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future.” Id. (quoting Evitts v. Lucey, 469 U.S. 387, 391 n.4, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)). These two possibilities span the progression of the Sibron presumption. The Court has consistently repeated the idea that a conviction subjects a criminal defendant to the potential for an increased sentence for a subsequent conviction resulting from a not-yet-extant criminal prosecution. See, e.g., Minnesota v. Dickerson, 508 U.S. 366, 371 n.2, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)[15]; Pennsylvania v. Mimms, 434 U.S. 106, 108 n.3, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); Benton v. Maryland, 395 U.S. 784, 790-91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); Sibron, 392 U.S. at 55-56, 88 S.Ct. 1889. In these cases, the Court has also referred to the potential impeachment to which a defendant may be subject in future proceedings. See, e.g., Benton, 395 U.S. at 791, 89 S.Ct. 2056; Sibron, 392 U.S. at 55-56, 88 S.Ct. 1889; see also Spencer, 523 U.S. at 10, 118 S.Ct. 978; Evitts, 469 U.S. at 391 n.4, 105 S.Ct. 830. Notably, these two consequences both require uncertain future proceedings, the first of which would occur, if at all, by virtue of the defendant’s subsequent criminal conduct — i.e., circumstances of his own making.[16] Thus, the first effect of the presump *224 tion is to accept a broader category of consequences as sufficient for purposes of avoiding mootness.
Next, we turn to how the presumption affects the parties’ obligations to present and prove the existence of collateral consequences. Although Spencer marked the Supreme Court’s most complete discussion of the presumption, the Court never explicitly identified the nature or operation of the presumption.[17] Lower federal courts have nonetheless overwhelmingly treated the Sibron presumption as rebuttable and placed the burden on the state to prove that no collateral consequences will result. See United States v. Quezada-Enriquez, 567 F.3d 1228, 1232 n.2 (10th Cir. 2009); D.S.A. v. Circuit Court Branch 1, 942 F.2d 1143, 1146 n.3 (7th Cir. 1991); Malloy v. Purvis, 681 F.2d 736, 739 (11th Cir. 1982); Felton v. Mazzuca, No. 98 Civ. 4567(RJS), 2012 WL 4462009, at *6 n.4 (S.D.N.Y. Sept. 27, 2012); United States v. Hill, 171 F.Supp.2d 1032, 1037-38 (D.S.D. 2001). But see Choker v. Crogan, 428 F.3d 1215, 1219 (9th Cir. 2005) (recognizing conclusive presumption).
We think the majority approach is correct. Sibron held “that a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.” 392 U.S. at 57, 88 S.Ct. 1889. This language suggests that the presumption may be rebutted and provides a standard of proof for that rebuttal — “no possibility” of collateral consequences. Further, Spencer's observation that the presumption is an anomaly in Article III standing weighs against making its application conclusive even where the proof shows no collateral consequences. See 523 U.S. at 12, 118 S.Ct. 978.
Where the burden of proof rests is a more difficult question. The burden of proof is commonly understood to encompass both the obligation to produce some evidence on an issue — ie., the burden of production — and the obligation to persuade the decision maker that the standard of proof has been met in one’s favor — ie., the burden of persuasion. See Burden of Proof, Black’s Law Dictionary (10th ed. 2014). Were we to conclude that the Sibron presumption imposes both obligations on the state, we would be requiring the state both to present potential collateral consequences to the reviewing court and then disprove them. There are numerous problems with such an approach, not the least of which is the difficulty inherent in *225 proving a universal statement[18] — that no collateral consequences exist. Further, it creates a situation in which — through human error or otherwise — a state may fail to present an extant collateral consequence to the court, which would have established that the habeas petition was not moot. Finally, forcing a state to argue against itself would go even further afield from the traditional application of standing, in which the proponent of jurisdiction bears the burden of “alleging] facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.” Spencer, 523 U.S. at 11, 118 S.Ct. 978 (internal quotation marks omitted).
By contrast, requiring habeas petitioners to identify at least some collateral consequence that threatens them balances practical considerations and operation of the presumption. In the ordinary case, petitioners — and the court — may look to the consequences regularly appearing in this context: e.g., future sentence enhancement, impeachment, or civil disabilities. Where those readily identifiable consequences are not present, however, the state should not bear the burden of both identifying and refuting every possible alleged consequence in its laws. Mindful of the Supreme Court’s caution in this area, we conclude that a petitioner seeking ha-beas review must identify some continuing collateral consequences that may flow from his criminal conviction — including those that, as discussed above, are merely hypothetical and speculative.[19] Once a petitioner does so, however, the state bears the burden to prove by sufficient evidence that there is “no possibility” such consequences will attach to his conviction. See Sibron, 392 U.S. at 57, 88 S.Ct. 1889.
With our framework established, we apply the Sibron presumption to the facts of this case. Nowakowski has identified a sufficient collateral consequence to avoid mootness in this case— namely, the potential for impeachment in a future proceeding.[20] Under New York law, the trial court in its discretion may permit cross-examination into a criminal defendant’s prior bad acts or crimes upon balancing the probative value of the evidence with the risk of unfair prejudice. See generally People v. Sandoval, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974). In these instances, the defendant bears the burden “of demonstrating that the prejudicial effect of the admission of evidence thereof for impeachment purposes would so far outweigh the probative worth of such evidence on the issue of credibility as to warrant its exclusion.” Id. at 378, 357 N.Y.S.2d 849, 314 N.E.2d 413.
Additionally, where a criminal defendant presents evidence of his good character, *226 the prosecution may prove a conviction tending to negate such trait; similarly, where conviction of an offense “constitutes an element of the offense charged, or proof thereof is otherwise essential to the establishment of a legally sufficient case,” the previous conviction may be proved. N.Y. CRIM. PROC. Law § 60.40[2]-[3].[21] In least one decision, the Appellate Division has held that a conviction for harassment in the second degree can be the subject of proper cross-examination. See People v. Hogencamp, 295 A.D.2d 643, 643-44, 743 N.Y.S.2d 608 (N.Y. 3d Dep’t 2002); see also N.Y. Crim. Proc. Law § 60.40[1] (permitting independent proof of conviction where it is a proper subject of cross-examination and the defendant denies or answers equivocally). Consequently, we conclude that Nowa-kowski’s conviction subjects him to the possibility of impeachment in a future criminal proceeding and thus presents a sufficient continuing collateral consequence to satisfy the requirements of a live case or controversy. See Evitts, 469 U.S. at 391 n.4, 105 S.Ct. 830; Sibron, 392 U.S. at 55-56, 88 S.Ct. 1889.[22]
III.
We conclude by addressing our colleague’s thoughtful dissenting opinion. As we read it, the dissent’s principal thesis is that the Sibron presumption was designed to apply — and therefore only applies — to convictions from which significant collateral consequences are likely to result.[23] See, e.g., Dissenting Op., post, at 229, 236. We think the dissent’s approach is incompati *227 ble with the Supreme Court’s practice and statements. As an analytical matter, the dissent conflates the separate steps undertaken in Sibron and Spencer into a single inquiry about whether collateral consequences do in fact flow from the defendant’s conviction. In other words, the dissent’s approach would require a court to find that collateral consequences generally flow from the conviction before it applies a presumption that assumes, as a first step subject to rebuttal, that collateral consequences generally flow from the conviction. Such an approach is, of course, no presumption at all — and if it were the approach the Supreme Court intended, Spencer could have been a great deal shorter and far less concerned with the presumption’s anomalous place in Article III standing analysis.
The Spencer Court described its precedents as being “willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur).” Spencer, 523 U.S. at 8, 118 S.Ct. 978 (emphasis added); see also id. at 10, 118 S.Ct. 978 (“[After Sibron], and in summary fashion, we proceeded to accept the most generalized and hypothetical of consequences as sufficient to avoid mootness in challenges to conviction.” (emphasis added)). It also characterized its past practice as “presuming collateral consequences (or of accepting the remote possibility of collateral consequences as adequate to satisfy Article III).” Id. at 10, 118 S.Ct. 978 (emphasis added); see also id. at 12, 118 S.Ct. 978 (describing it as “our presumption of collateral consequences (or our willingness to accept hypothetical consequences)”). The dissent appeals to the single instance in Spencer that uses the terms “significant” and “likely”: “In the context of criminal conviction, the presumption of significant collateral consequences is likely to comport with reality. As we said in Sibron, it is ‘an obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.’ ” Id. at 12, 118 S.Ct. 978 (quoting Sibron, 392 U.S. at 55, 88 S.Ct. 1889). But here is the language immediately following that line in Sibron: “The mere ‘possibility’ that this will be the case is enough to preserve a criminal case from ending ‘ignominiously in the limbo of mootness.’ ” 392 U.S. at 55, 88 S.Ct. 1889 (quoting Pollard v. United States, 352 U.S. 354, 358, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), and Parker v. Ellis, 362 U.S. 574, 577, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960) (Warren, C.J., dissenting)). The dissent’s attempt to convert the presumption’s operation into an examination of the likelihood of collateral consequences for the conviction at issue, see post, at 239, is inconsistent with the Court’s actual practice, as well as Spencer's description of that practice.[24]
The dissent’s approach is also in significant tension with Minnesota v. Dickerson, *228 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). As we note above, see supra nóte 15, Dickerson involved a case in which “no judgment of conviction was entered and, upon respondent’s successful completion of probation, the original charges were dismissed,” and in which a Minnesota law specifically prohibited the proceeding from being “deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose.” 508 U.S. at 371 n.2, 113 S.Ct. 2130 (quoting Minn. Stat. § 152.18). It is hard to imagine a case — including this one — that would meet the dissent’s proposed standard less than Dickerson — and yet the Spencer Court cited it as an example of the presumption without a hint of disavowal, see 523 U.S. at 10, 118 S.Ct. 978.
In short, we think the dissent’s approach begs the question by demanding evidence of collateral consequences to invoke a re-buttable presumption that assumes those consequences exist. Accepting the dissent’s propositions would also require us to conclude that what the Supreme Court has called a “presumption,”- Spencer, 523 U.S. at 8, 118 S.Ct. 978, is not really a presumption at all; that when the Court said the presumption “is applied to criminal convictions,” id. it meant to say, but did not, that it is applied only to serious criminal convictions; and that when the Court said “a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of- the challenged conviction,” Sibron, 392 U.S. at 57, 88 S.Ct. 1889, it did not really mean the words only, no, or any. While the Supreme Court may choose to cabin the presumption to specific offenses of a certain order of magnitude in the future, the Court has not done so yet. We therefore “leav[e] to [the Supreme Court] the prerogative of overruling its own decisions,” Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), and take the Court at its word.[25] Because Nowakowski has identified the possibility of a collateral consequence stemming from a criminal conviction — a consequence significant enough to have been accepted by the Supreme Court in the past — his case is not moot.
CONCLUSION
In sum, Nowakowski was in. custody for the purposes of habeas review while under a sentence of conditional discharge that obligated him to appear in specific places at specific times and subjected him to the discretion of the court to modify or revoke his discharge. In addition, Nowakowski’s conviction is criminal for the purposes of the Sibron presumption, and he has identified a continuing collateral consequence under its application. His petition thus presents a live case or controversy sufficient to sustain federal jurisdiction. Accordingly, the District Court’s order of May 30, 2014, is hereby VACATED, and the case is REMANDED to the District Court for further proceedings consistent with this opinion.

. We reject Nowakowski’s arguments that his case should be reassigned to a different judge. The principal basis upon which Nowakowski challenges Judge Vitaliano’s impartiality is his judicial rulings, which "alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). *214 Political contributions received by Judge Vita-liano when he served in elected office — more than five years prior to his confirmation as a federal judge and more than twelve years prior to Nowakowski’s petition — are not the “unusual circumstances where ... an assignment to a different judge is salutary and in the public interest." United, States v. Robin, 553 F.2d 8, 10 (2d Cir. 1977) (en banc) (per cu-riam) (internal quotation marks omitted).

.Unless otherwise noted, the following facts are taken from the parties’ briefing and are undisputed.

. As Nowakowski’s appendix lacks global pagination, our citations use the PDF pagination as available on this Court's electronic docket (ECF No. 34).

. Nowakowski states he completed the service as ordered on July 2. See Appellant Br. 6. The People disclaim knowledge of the specific date but agree that, in any event, the community service was completed after July 1 and before July 9. See Appellee Br. 6.

. Though the question of custody was not argued by the People below nor decided by the District Court, the requirement of custody is jurisdictional, see Ogunwomoju v. United States, 512 F.3d 69, 75 (2d Cir. 2008), and thus, we have an obligation to consider it nostra sponte, see Soto v. United States, 185 F.3d 48, 51 (2d Cir. 1999).

. The People contend that Nowakowski should be estopped from claiming federal habeas relief since his sentence was converted from a fine to conditional discharge at his request. They base this argument on two propositions: that Nowakowski viewed conditional discharge and community service as less onerous than the fine, and that his request was a strategic attempt to qualify himself for federal habeas relief. We find no support for these conclusions in the record. Nowakowski has put forth the reason for his request — indigence, a rationale the Criminal Court accepted by entering a new sentence. Further, it stretches credulity that a convicted defendant would voluntarily seek a sentence that subjects him to objectively increased restraint solely to gain mere access tó — not relief in — federal habeas proceedings. The People have also presented no law supporting a theory of estoppel applied to access to federal habeas, and we decline to create any now.

. That the Criminal Court could have revoked the conditional discharge if Nowakowski committed "an additional offense,” N.Y. Penal Law § 65.05[2], was a particularly broad vulnerability. An "offense” under New York law, as we discuss more extensively infra at Part II.A, is “conduct for which a sentence to a term of imprisonment or to a fine is provided” by state or local law, ordinance, or regulation — everything from a traffic infraction to a felony. N.Y. Penal Law § 10.00[l]-[5],

. But see infra, (discussing a situation in which the Supreme Court arguably applied the presumption outside of the context of a formal conviction).

. In fact, application of a different test wotdd create serious potential for absurd results, such that a federal court applying federal doctrine could conclude that the same conviction is simultaneously criminal and not.

. Although New York expressly states that punishment for a traffic infraction "shall not be deemed for any purpose a penal or criminal punishment,” N.Y. Veh. & Traf. § 155, it maltes no such declaration with respect to violations.

. However, Connecticut excludes traffic infractions from its definition of "offense.” See Conn. Gen. Stat. § 53a-24(a).

. Where statutory intent to designate a sanction as civil is clear, " 'only the clearest proof’ will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.” Hudson v. United States, 522 U.S. 93, 100, 118 S.Ct 488, 139 L.Ed.2d 450 (1997) (quoting Ward, 448 U.S. at 249, 100 S.Ct. 2636).

. In so doing, we are mindful of the Hudson Court's admonition that consideration of these factors should evaluate "the statute on its face” rather than "assess the character of the actual sanctions imposed.” 522 U.S. at 101, 118 S.Ct. 488 (internal quotation marks omitted).

. As our analysis here relies upon cases involving federal constitutional criminal protections, such as the Double Jeopardy Clause or the Ex Post Facto Clause, a contrary conclusion as to the criminal nature of violations in this case would call into question the availability of those protections for such offenses. Our conclusion avoids that result, but we raise the issue to illustrate that Nowakowski's conviction is best understood as a criminal sanction as a matter of federal law.

. Though lacking express analysis of whether the presumption should apply, Dickerson supports our earlier conclusion that the presumption applies to Nowakowski’s conviction. There, the Supreme Court dealt with a diversionary sentencing scheme for possession of a controlled substance, pursuant to which "no judgment of conviction” was entered and, following probation, “the original charges were dismissed.” Dickerson, 508 U.S. at 371 n.2, 113 S.Ct. 2130. Minnesota law further specified that the proceeding in which Dickerson was found guilty "shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose.” Id. (quoting Minn. Stat. §152.18). Nonetheless, the Court held that "a nonpublic record of the charges dismissed,” which state law required the state department of public safety to retain, "would carry collateral legal consequences” because of hypothetical future sentencing. Id. Since Spencer cites Dickerson as an example of the presumption, we see no evidence the Supreme Court has walked away from this application. See Spencer, 523 U.S. at 10, 118 S.Ct. 978. If Dickerson qualified for the presumption (1) without a judgment of conviction, (2) with eventual dismissal of the original charges, and (3) with an express statement in law prohibiting treating him as a criminal convict, we have difficulty concluding that Nowakowski's formal conviction and sentence falls outside of its scope.

. It goes almost without saying that such speculative, partially self-inflicted results would not satisfy Article III outside of the context of the Sibron presumption. E.g., Lane, 455 U.S. at 633 n.13, 102 S.Ct. 1322 ("The parole violations that remain a part of respondents’ records cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and *224 become eligible for parole. Respondents themselves are able — and indeed required by law — to prevent such a possibility from occurring.”); accord Probber, 170 F.3d at 349.

. Traditionally, presumptions have been divided into two categories: conclusive presumptions (presumptio juris et de jure), which are essentially rules of law and cannot be overcome no matter the strength of the contrary proof, and rebuttable presumptions (pre-sumptio juris tantum), which merely act as evidence which can be contradicted by sufficient contrary evidence or determine the case when the evidence is in equipoise. See William Callyhan Robinson, Elements of American Jurisprudence § 375 (1900); Best on Presumptions § 17 (1845). More recently, however, the Supreme Court has loosely identified four categories of presumptions in the context of the burden of proof: (1) permissive inferences, which allow but do not require a conclusion, (2) shifting the burden of production, such that a conclusion must be drawn only if no evidence has been produced to the contrary, (3) shifting the burden of persuasion, such that the adversely affected party bears the burden of overcoming the presumption with sufficient evidence, or (4) conclusive presumptions, such that the result is determined regardless of the evidence. See Sandstrom v. Montana, 442 U.S. 510, 514-18, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

. See generally Kevin W. Saunders, The Mythic Difficulty in Proving a Negative, 15 Seton Hall L. Rev. 276 (1985) (noting that the proverbial difficulty in proving a negative is, in reality, difficulty in proving a universal statement).

. Additionally, we note that even where a criminal conviction is the subject of the inquiry, if the identified collateral consequences arise from separate and independent grounds from that conviction, the conviction “can have no meaningful effect ... and hence cannot serve as a possible collateral consequence.’’ Perez v. Greiner, 296 F.3d 123, 126 (2d Cir. 2002). This principle does not mean, however, that all convictions after the first (or most severe) do not have collateral consequences, if each marginally increases some risk or consequence. See Sibron, 392 U.S. at 56, 88 S.Ct. 1889.

.Nowakowski’s brief focuses on the threat of impeachment in his § 1983 suit. However, because of the prevalence of impeachment as a collateral consequence and our obligation to construe pro se submissions. liberally, we interpret Nowakowski’s briefs and oral arguments to challenge the threat of impeachment through use of his conviction generally.

. In fact, the Sibron Court cited the predecessor statute to § 60.40 as the basis for its conclusion that the defendant could be subject to impeachment in a subsequent criminal proceeding. See 392 U.S. at 55-56, 88 S.Ct. 1889.

. Nowakowski has also argued that his conviction bars his § 1983 action under the doctrine of Heck v. Humphrey, supra, and that bar constitutes an additional collateral consequence. Though the People urge us to hold that Spencer squarely forecloses this argument, we decline to do so for two reasons. First, Spencer ultimately concluded no presumption should apply to parole revocations and thus held that the Heck bar was insufficient under the traditional rules of Article III standing, rather than the relaxed standard applicable to convictions. See 523 U.S. at 17, 118 S.Ct. 978. Second, we think the discus-sibn in Spencer is less clear-cut than the People maintain. Although seven Justices joined Justice Scalia in concluding that the Heck argument was “a great non sequitur,” id. half the majority v/roie in concurrence that if Heck did in fact bar the action, it "would provide a reason, whether or not dispositive, to recognize continuing standing to litigate his habeas claim," id. at 19, 118 S.Ct. 978 (Souler, J., joined by O'Connor, Ginsburg, and Breyer, JJ., concurring). The concurring Justices concluded, however, that "Spencer is free to bring a § 1983 action, and his corresponding argument for continuing habeas standing falls accordingly.” Id. We find unclear, therefore, Spencer's discussion of the Heck bar as a continuing collateral consequence where (1) a conviction, rather than a parole revocation, is challenged and (2) where Heck would in fact bar the claim. However, because the possibility of impeachment constitutes a sufficient collateral consequence, we need not decide No-wakowski’s Heck bar argument.

.The dissent insists that its approach cabin-ing the Sibron presumption to certain "categories” of criminal convictions "is not [its] own.” Post at 231-32 n.6. Spencer, the dissent claims, did the same by refusing to apply Sibron to a parole revocation. Id. (citing Spencer, 523 U.S. at 12, 118 S.Ct. 978). The dissent misreads Spencer’s categorization of types of adjudication as an invitation to sub-categorize further. Rather than debating whether we should apply Sibron to a new "category of adjudication”- — e.g., a criminal conviction, a parole revocation, or a designation as an enemy combatant- — the dissent proposes that we split the category of criminal convictions into subcategories: criminal convictions significant enough to warrant Sibron and those too insignificant to warrant Sibron. That new process of subcategorizing is novel and may someday be the law. But today, it is not.

. We also note that the dissent’s reliance on a degree of "likelihood” will result in practical chaos. Automatic statutory disabilities— like disenfranchisement or employment disqualification, see Dissenting Op., post, at 231-32, 231 n.7 — do not require operation of a presumption; they are actual, extant consequences from which the defendant currently suffers. Thus, the only function of the presumption is with respect to hypothetical, future consequences. But a court applying a "likelihood” approach would have to determine whether hypothetical collateral consequences, e.g., denials of handgun permits in New York City — authorized when an individual has been convicted of a violation, see Rules of the City of New York, tit. 38, § 5-10(a), are more or less likely than those the Supreme Court has identified, e.g., the potential for future criminal prosecution. Asking a court to make that determination seems to invite judicial speculation or, worse, attempts at a Minority Report-like predictive criminology.

. We express no opinion about how we would apprpach this question from a “blank slate.” Dissenting Op., post, at 241. When confronted with Supreme Court precedent, it is not the job of this Court to ruminate on what it might do without that guidance. Our refusal to engage the dissent's "blank slate” should not be confused for implicit approval of the dissent’s novel approach.